UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION


| | | |
|---|---|---|
| JERRI A. COURTNEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:13 CV 115 DDN |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |


## MEMORANDUM

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying Jerri A. Courtney's applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and for supplemental security income under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). Because the Commissioner's final decision is supported by substantial evidence on the record as a whole, it is affirmed.

### I. Procedural History

In January 2009, plaintiff Jerri A. Courtney applied for disability insurance benefits (DIB) and supplemental security income (SSI) claiming that she became disabled on May 30, 2008, because of a lower lumbar injury. (Tr. 192-98, 199-202, 227.) On March 2, 2009, the Social Security Administration denied plaintiff's claims for benefits. (Tr. 77, 78, 101-05.) At plaintiff's request, a hearing was held before Administrative Law Judge (ALJ) Edward C. Graham on August 12, 2010, at which plaintiff and a vocational expert testified. (Tr. 52-76.) On September 17, 2010, ALJ Graham issued a decision denying plaintiff's claims for benefits, finding plaintiff able to perform her past relevant work as a storage facility clerk and hotel desk clerk and, alternatively, to be able to perform other work as it existed in significant numbers in the national economy. (Tr. 81-91.) Plaintiff thereafter requested the Appeals Council to review this adverse decision. (Tr. 152-54.)

In January 2011, while her request for review was pending, plaintiff filed new applications for benefits, upon which the agency determined plaintiff had been disabled as of September 18, 2010, the day after ALJ Graham's decision. (*See* Tr. 97.) On June 11, 2012, the Appeals Council affirmed this finding and, further, granted plaintiff's request for review of the ALJ's decision on the January 2009 applications. The Appeals Council vacated ALJ Graham's September 2010 hearing decision and remanded the matter with instruction to further evaluate the period prior to September 18, 2010. The Appeals Council specifically ordered the ALJ upon remand to:

- Update the medical evidence in the record to include the evidence considered on the subsequent applications and, if necessary, obtain evidence from a medical expert to clarify the nature and severity of plaintiff's impairments;

- Evaluate plaintiff's mental impairments in accordance with 20 C.F.R. §§ 404.1520a and 416.920a;

- Give further consideration to treating, nontreating, and nonexamining source opinions under §§ 404.1527 and 416.927;

- Give further consideration to plaintiff's maximum residual functional capacity (RFC) and provide appropriate rationale in support of the assessed limitations; and

- Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on plaintiff's occupational base.

(Tr. 97-99.)

Upon remand, ALJ Thomas Muldoon conducted a supplemental hearing on October 16, 2012, at which plaintiff testified. A vocational expert did not testify at this hearing, nor was any supplemental evidence obtained from a vocational expert. (Tr. 28-51.) On November 9, 2012, ALJ Muldoon issued a decision denying plaintiff's claims for benefits, finding that, through September 17, 2010, plaintiff was able to perform her past relevant work as a hotel desk clerk and storage facility clerk. (Tr. 13-23.) On June 4, 2013, the Appeals Council denied plaintiff's

request for review of this decision. (Tr. 1-5.) ALJ Muldoon's decision of November 9, 2012, thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action, plaintiff seeks judicial review of the Commissioner's final decision, arguing that ALJ Muldoon legally erred by: (1) failing to obtain evidence from a vocational expert upon remand, as ordered by the Appeals Council; (2) faulting plaintiff for failing to provide additional evidence of her mental impairment for a period during which she was already found to be disabled; and (3) failing to include any mental limitations in the RFC determination.[1] Plaintiff requests that the final decision be reversed and that she be awarded benefits or that the matter be remanded for further consideration. For the reasons that follow, the ALJ did not err and the final decision of the Commissioner is affirmed.

## II. Testimonial Evidence Before the ALJ

A.  Hearing Held August 12, 2010

1.  *Plaintiff's Testimony*

At the hearing on August 12, 2010, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was fifty years of age. Plaintiff stands five feet tall and weighs 132 pounds. Plaintiff lives in a house with her husband and brother-in-law. Plaintiff went to high school through the tenth grade and obtained her GED when she was forty years of age. Plaintiff currently receives Medicaid benefits. (Tr. 57-58.)

Plaintiff's Work History Report shows plaintiff worked intermittently as a machine operator at a factory between 1993 and 2000. From 1994 to 1996, plaintiff worked as a milk hand and dairy manager at a dairy farm. Between 1995 and 2006, plaintiff worked intermittently in sales and telemarketing. From 1998 to 2000 and again from 2003 to 2006, plaintiff worked as a certified nurses' assistant (CNA) at a nursing home/hospital. In 2006, plaintiff worked cleaning condominiums. From 2006 to 2007, plaintiff worked as a front desk associate and front desk supervisor at a hotel. Plaintiff testified that this job ended because she could not physically perform the work she was required to do, that is, go up and down stairs and lift small appliances such as mini refrigerators and microwaves. From 2007 to May 2008, plaintiff worked as a storage coordinator at an RV/camping resort. Plaintiff testified that she was terminated without

_____

[1] Plaintiff also claimed that the ALJ used the wrong standard in requiring her to show mental limitations for twelve continuous months. (Pltf.'s Brief, Doc. #23 at p. 15-16.) In her Reply

reason from this job. She testified that she was having a few medical problems when this job ended, but none that she thought interrupted her work. (Tr. 59, 239.)

Plaintiff testified being currently unable to work because of back spasms and pain. Plaintiff testified that she experiences such spasms every day if she sits or stands in one place too long. She takes Advil and Diazepam (Valium) and uses a TENS unit for the condition. Plaintiff experiences no side effects from her medication. Plaintiff testified that she also has sporadic sleep and wakes every couple of hours during the night. (Tr. 62-63, 67.)

Plaintiff testified that she was recently sent to a counselor for anxiety and depression but felt that she was having no depressive symptoms. Plaintiff testified that she feels anxious regarding her finances but characterized it as "mainly normal human feelings." Plaintiff takes Celexa for her condition and experiences no side effects from this medication. (Tr. 66-67.)

As to her exertional abilities, plaintiff testified that she can sit for about five minutes without having to move around. She can stand in one place for about fifteen minutes before experiencing spasms, but she can be on her feet for about an hour and a half if she is able move around. Plaintiff has no difficulty going up stairs but feels as though her back is being pulled apart when she comes down stairs. (Tr. 63-64.) Plaintiff can lift up to thirteen pounds, but with pain. (Tr. 64-65.) Plaintiff can bend and crouch if there is something for her to hold on to to help her get back up. (Tr. 65-66.)

As to her daily activities, plaintiff testified that she gets up at 5:00 a.m. and goes to bed around 11:00 p.m. During the day, plaintiff cooks and does the dishes. She visits her mother who lives nearby and talks with her daughter on the telephone. Plaintiff has friends and interacts with neighbors. She likes to read and draw. Plaintiff naps during the day because of her lagging energy. Plaintiff's husband does the laundry, vacuuming, and the grocery shopping. Plaintiff is able to care for her personal needs but has difficulty with shoes that tie. (Tr. 67-69.)

      2.    *Testimony of Vocational Expert*

George H. Horne, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Mr. Horne testified that plaintiff's past work as a nurses' assistant was semi-skilled and medium; as a hotel clerk as semi-skilled and light; and as a storage facility rental clerk as unskilled and light. (Tr. 71.)

---

Brief, plaintiff withdrew this claim. (Pltf.'s Reply, Doc. #27 at p. 1.)

The ALJ asked Mr. Horne to assume an individual of plaintiff's age and education and who could perform light work with mild pain. The ALJ asked Mr. Horne to further assume that the person could stand or walk six out of eight hours; sit six out of eight hours; and could occasionally climb, balance, stoop, kneel, crouch, and crawl. Mr. Horne testified that such a person could perform plaintiff's past work as well as other light, unskilled work as a production assembler, of which 1,000 such jobs exist in the State of Missouri and 50,000 nationally. (Tr. 71-72.) Mr. Horne testified that such jobs allow for a sit/stand option but that needing to alternate positions more frequently than every thirty minutes would be problematic. (Tr. 73.) Mr. Horne also testified that a person limited to lifting twenty pounds on a less-than-occasional basis would not be able to perform light, unskilled work but could perform sedentary work. Mr. Horne further testified that a person limited to lifting up to ten pounds on a less-than-occasional basis could likewise perform sedentary work. (Tr. 74-75.)

B      Hearing Held on October 16, 2012

At the supplemental hearing on October 16, 2012, plaintiff testified in response to questions posed by the ALJ and counsel. Plaintiff understood that the hearing involved obtaining testimony regarding the period from May 30, 2008, to September 17, 2010. (Tr. 32.)

At the time of the hearing, plaintiff was fifty-three years of age. Plaintiff lives in a house with her husband and mother. (Tr. 32.)

Plaintiff testified that, during the relevant period, she received food stamps as well as unemployment benefits from August 2008 through June 2010. Plaintiff obtained Medicaid insurance in August 2010. (Tr. 33.) Plaintiff testified that she had also received a workers' compensation award as a result of a back injury she sustained while lifting a patient at Skaggs Hospital. (Tr. 37-38.)

Plaintiff testified that she could not work during the relevant period because of spasms in her spine that sometimes caused her leg to give out. Plaintiff testified that she took Valium at the time to help with the spasms. Plaintiff testified that she also experienced a constant throbbing pain in her left leg. Plaintiff testified to having a right prosthetic ankle, but that the ankle caused no problems during the relevant time. (Tr. 42-43.)

As to her exertional abilities during the relevant period, plaintiff testified that she could stand no longer than fifteen minutes before experiencing "horrific" pain in her spine and down her legs. Plaintiff testified that she could sit no longer than fifteen minutes. Plaintiff testified

that she could walk about fifty yards without having to stop. Plaintiff could walk up stairs without difficulty but felt as though someone was pushing her from behind when walking down stairs. Plaintiff testified that she could lift no more than twenty pounds but probably could have lifted five to ten pounds on a repetitive basis. Plaintiff testified that she experienced pain while bending and would therefore squat before she had to bend. Plaintiff testified that she used a cane a couple of times when her left leg went out, but that her use of a cane was not prescribed. (Tr. 43-44.)

Plaintiff testified that her son was killed in 2007 and the trial involving his death occurred in 2008. (Tr. 42.) Plaintiff testified that she experienced a lot of anger issues, anxiety, and depression during the relevant period because of her back pain, dealing with her son's death, and knowing that the person who killed her son had served only a fourteen-month sentence. Plaintiff testified that she began seeing a mental health provider on a weekly basis during the latter part of 2010 and was prescribed medication. Plaintiff testified that she did not seek mental health treatment prior to such time because of her lack of insurance and her uninsurability due to a preexisting condition. (Tr. 45-46.)

As to her daily activities during the relevant time, plaintiff testified that she got up between 5:00 and 6:00 a.m. and would go to bed at 10:00 p.m. Plaintiff testified that it took some time for the Valium to take effect with respect to her spasms and that she therefore did not go to sleep until between 10:30 p.m. and midnight. Plaintiff testified that she did not nap during the day. Plaintiff testified that she would try to read but felt she had to constantly move because of spasms that would occur if she sat or stood too long. Plaintiff had friends during the relevant period and regularly spoke to her mother. Plaintiff testified that she sometimes went to the grocery store but would send someone else many times because of her pain. She occasionally did the dishes and straightened up around the house. Plaintiff did the laundry if her husband pulled the things out of the dryer for her. Plaintiff testified that her husband did the sweeping, mopping, and vacuuming and did the dishes most of the time. Plaintiff was able to care for her personal needs during the relevant period, except that her husband had to tie her shoes for her. (Tr. 46-48.)

### III. Medical Evidence Before the ALJ

On November 15, 2005, plaintiff visited Dr. Lynn E. Allison with complaints of radiating low back pain relating to a work injury sustained in September 2005. Physical examination

showed plaintiff to be stooped and guarded because of pain, to have decreased range of motion, and to exhibit evidence of left-sided spasm. Dr. Allison diagnosed plaintiff with low back pain secondary to probable strain. Dr. Allison noted that disc disease was possible, but opined that plaintiff's condition was mostly a bad strain that was not able to heal because of plaintiff's inability to rest. Plaintiff was instructed to avoid heavy lifting and sudden awkward movements, apply ice to the affected area, avoid prolonged sitting, and perform back stretches and exercises as tolerated. Skelaxin, Darvocet, and ibuprofen were prescribed. (Tr. 406-07.)

An x-ray of plaintiff's thoracic spine, taken on November 16, 2005, in response to plaintiff's complaints of back pain, showed no acute abnormality. Multiple calcified granulomas throughout the lungs bilaterally were noted. (Tr. 330.) An x-ray of the lumbar spine was unremarkable. (Tr. 329.)

On November 17, 2005, Leslie Thiessen, a physical therapist at Skaggs Community Health Center, evaluated plaintiff upon referral from Dr. Allison with regard to her complaints of back pain, spasms, and numbness in the left foot. PT Thiessen noted plaintiff's history to include a prosthetic right ankle in 1973, an appendectomy, gall bladder surgery in 2003, and a history of ovarian cancer. She noted that plaintiff had difficulty being seated during the evaluation, was in pain when seated, and sat with her left leg extended while leaning to the right. Plaintiff limped with the left leg while walking. Range of motion was limited in all directions because of pain. Extension and flexion was also limited about the left knee. Plaintiff had decreased sensation on the bottom of the left foot and significant muscle guarding throughout the lower spine at levels L1 through L4. PT Thiessen opined that plaintiff's symptoms were consistent with a disc injury that imposed significant limitations in plaintiff's ability to work and perform activities at home. A treatment plan was put in place. (Tr, 326-28.)

Plaintiff returned to Dr. Allison on November 22, 2005, with complaints of continued back pain and spasms. Dr. Allison recommended that plaintiff continue with physical therapy. Plaintiff was continued on her medications, and a referral to Dr. Weber was made. (Tr. 405.)

Plaintiff visited Dr. Chris Weber on December 5, 2005, and complained of shooting pain. Plaintiff reported that aquatic therapy provided only temporary relief and that use of a TENS unit and heat provided little benefit. Examination showed plaintiff to have tenderness and limited range of motion. Numbness was noted in the left leg and foot. Straight leg raising was positive on the left. Plaintiff could toe walk but almost fell backwards with heel walking. Dr. Weber

diagnosed plaintiff with lumbar pain with intermittent radicular features and possible weakness. Plaintiff was instructed to remain off work until MRI testing could be performed. Plaintiff was prescribed Valium for muscle spasm and sleep. Plaintiff was also prescribed Flexeril and Ultram. (Tr. 395-96.)

An MRI of the lumbar spine dated December 9, 2005, showed circumferential bulging disc at the L4-5 level with good preservation of disc height. Some disc desiccation was noted. The disc bulging was noted to cause some narrowing of the lateral recesses bilaterally, which could have a symptomatic mass effect in the L5 roots. (Tr. 320.)

After participating in eleven physical therapy visits, plaintiff was noted on December 15, 2005, to have improved but to continue to have high complaints of pain that limited her ability to work. PT Thiessen recommended continued physical therapy and a reassessment to determine the true cause of plaintiff's pain and weakness. (Tr. 324-25.)

Upon review of the MRI and additional examination, Dr. Weber released plaintiff to work on December 16, 2005, with restrictions that she be permitted to have a sit/stand option as tolerated, and not lift over five pounds below the knees or above the shoulders. (Tr. 397.)

On December 30, 2005, PT Laura Spencer recommended that plaintiff use a TENS unit for pain management outside of therapy. (Tr. 322-23.)

On January 6, 2006, plaintiff reported to Dr. Weber that her back pain had improved and she was able to work with the restrictions previously imposed. Examination showed plaintiff to have pain with range of motion about the low back in nearly all planes with guarded effort. No obvious pain to palpation was noted. Plaintiff could heel, toe, and tandem walk. Dr. Weber diagnosed plaintiff with annular tear at L4-5 with mild facet hypertrophy of the lower lumbar spine, and muscle spasm. Plaintiff was continued on her current medications. (Tr. 398.)

Plaintiff was discharged from physical therapy on January 31, 2006. (Tr. 321.)

Plaintiff returned to Dr. Weber on February 9, 2006, and reported increasing pain. It was noted that plaintiff was not taking any pain medication so as not to mask her symptoms. Plaintiff reported that stress at home and work seemed to aggravate her pain, which Dr. Weber advised was possible with tense muscles. Dr. Weber noted that plaintiff underwent a functional capacity exam at Cox Health whereupon it was concluded that plaintiff should be at light duty and limited to frequent lifting of no more than twenty-five pounds, sixty to seventy percent of the time. Dr. Weber noted that plaintiff's condition was not getting better and opined that she may well have a

disc/annular tear.  Dr. Weber opined that surgical intervention would not be beneficial given the lack of severity of symptoms.  Dr. Weber completed a "return to work" form that limited plaintiff to light duty and lifting twenty-five pounds occasionally/maximally, and instructed that she should be allowed to sit or stand every couple of hours as needed for comfort.  Dr. Weber noted that the limitations would likely not allow plaintiff to return to her traditional work duty without some modifications in duty requirements, or would require reassignment to another job. (Tr. 399.)

In April 2006, plaintiff was found eligible for services from the Missouri Division of Vocational Rehabilitation due to orthopedic impairments including accident/injury and degenerative joint disease (DJD) of the lumbar spine.  (Tr. 292.)  Her impairments were found to be substantial impediments to employment, and she was found unable to return to her previous employment as a CNA.  She was restricted to lifting no more than twenty pounds with no prolonged standing, walking, or climbing stairs; and was advised to avoid work tasks requiring heavy lifting, bending, and thrusting.  A medical consultant and a counselor concurred in the diagnosis of DJD of the lumbar spine. (Tr. 293.)  In July 2006, after approximately two weeks of evaluation, vocational evaluator Linda Wilks of the Missouri Rehabilitation Center reported that plaintiff's barriers to employment opportunities included bending, twisting, crouching, stooping, a lifting limit of twenty-five pounds, pushing, pulling, carrying, math computation without a calculator, crawling, climbing, and running.  (Tr. 297.)  However, it was thought that plaintiff would be a good candidate for additional schooling or training in the career fields of phlebotomist and pharmacy technician.  (Tr. 299.)

Plaintiff visited Dr. Shane Bennoch on August 22, 2006, for a physical examination in relation to her workers' compensation claim.  Dr. Bennoch reviewed records of plaintiff's previous treatment and conducted his own examination.  It was noted that plaintiff had not received any care relating to her back condition since January 2006.  Plaintiff reported improvement in her symptoms and that her pain was currently at a level one or two on a scale of one to ten, but that she experienced spasms in her low back if she stood, sat, or leaned too long in the same position.  Examination showed plaintiff to have decreased pinprick sensation about the left lower leg and positive straight leg raising on the left.  Plaintiff's balance and gait were unremarkable.  Plaintiff did not walk with a limp.  Tenderness and limited range of motion were noted about the lumbar spine.  Dr. Bennoch noted plaintiff to have had some gradual

improvement since her last visit to Dr. Weber and that she no longer had any left radiculopathy. Dr. Bennoch diagnosed plaintiff's present condition as traumatic injury of the low back secondary to lifting at work, and lumbar disc disease with annular tear at L4-5 and L5 radiculopathy. Dr. Bennoch determined plaintiff to have a twenty percent permanent partial impairment to the body at the lumbar spine and opined that plaintiff was temporarily totally disabled following the September 2005 injury to the present time. Dr. Bennoch did not recommend any further testing or reevaluation. Plaintiff was cautioned as to bending, twisting, lifting, and walking up and down stairs. Dr. Bennoch encouraged plaintiff to train as a phlebotomist since the work would be best suited to her current limitations. (Tr. 423-37.)

On October 17, 2006, plaintiff was admitted to the emergency room at Skaggs Community Health Center with complaints of back pain. Plaintiff's current medications were noted to be Valium and Ultram. Plaintiff was given Skelaxin, Flexeril, and Ultram and was discharged that same date in improved and stable condition. Plaintiff was diagnosed with acute myofascial strain of the lumbar spine. (Tr. 318-19.)

Plaintiff visited Dr. Weber on October 19, 2006, with complaints of a recent onset of thoracic back pain described as intermittent squeezing and cramping. Plaintiff rated her chronic low back pain to be at a level three and reported that she used a TENS unit. Plaintiff reported that she was terminated from her job at the end of February. Her husband also lost his job, and Dr. Weber noted there to be significant social stressors. Upon physical examination, Dr. Weber's impression was that plaintiff had sub-acute right lower thoracic strain and possible anxiety issues and stressors. Plaintiff was instructed to take ibuprofen and Valium for muscle spasm. (Tr. 400-01.) A chest x-ray taken that date yielded results that were unchanged from the November 2005 study. (Tr. 317.)

On May 31, 2007, the Missouri Division of Workers' Compensation assigned a permanent disability rating of fifteen percent of the body as a whole attributed to plaintiff's low back injury sustained in September 2005, and specifically, a strain with annular tear of the L4-5 disc. (Tr. at 332-49.)

On May 7, 2008, plaintiff visited Dr. Allison with complaints relating to bronchitis. No other complaints were noted. (Tr. 403-04.)

On February 5, 2009, plaintiff underwent a consultative physical examination at Skaggs Occupational Health for disability determinations. Plaintiff complained of back pain, arthralgia,

muscle spasms, muscle weakness, and joint stiffness and reported that she currently used heat, rest, acetaminophen, ibuprofen, and "topicals" to treat her condition. Plaintiff also reported using a TENS unit for management of spasms. Dr. Randall J. Cross noted that plaintiff would not consider surgery for her condition. Plaintiff was currently limited to lifting no more than twenty-five pounds, as imposed by Dr. Weber. Plaintiff also reported having headaches, numbness, paresthesia, and problems with balance as well as feelings of sadness, low energy, tearfulness, and sleep disturbance. It was noted that plaintiff had not worked since May 2008. Physical examination showed plaintiff to slightly limp with the left leg and to be unsteady in attempting to heel walk. Plaintiff could toe walk and rock back on her heels. Plaintiff needed assistance rising from a squatting position. Diffuse tenderness was noted about the lower lumbosacral spine region with guarding on pressure over the sacroiliac joints. Plaintiff had normal range of motion and strength about the upper and lower extremities. Slightly decreased range of motion was noted with flexion and extension of the lumbar spine. Decreased sensation was noted about the left anterior shin region. Straight leg raising in a seated position elicited radicular pain into the left leg in an L5 distribution. Mental status examination showed plaintiff's judgment and insight to be intact. Plaintiff was oriented times three. Her memory was intact for recent and remote events. She was noted to not exhibit any anxiety, depression, or agitation. Upon conclusion of the examination, Dr. Cross diagnosed plaintiff with chronic low back pain, history of asthma, and lumbar radiculopathy on the left. With regard to plaintiff's work-related functions, Dr. Cross opined that plaintiff could hear, speak, and travel but recommended that she get out of a vehicle every one to two hours to walk and stretch to avoid low back stiffness. Plaintiff could finger, feel, and handle objects. Dr. Cross continued plaintiff on the twenty-five-pound lifting restriction due to her lumbar radiculopathy and disc protrusion at the L4-5 level. Dr. Cross further recommended that plaintiff avoid high impact activities such as jumping, jogging, and running and should also avoid repetitive bending and stooping activities. (Tr. 369-76, 379.)

On April 13, 2010, plaintiff underwent a consultative physical examination for the Missouri Department of Social Services and complained of lumbar pain, left leg pain, left leg weakness, and right shoulder pain. Plaintiff's only medication was noted to be Advair. Examination showed plaintiff to have decreased range of motion about the lumbar spine, decreased strength in the left leg, and positive straight leg raising on the left. Plaintiff's upper

extremities were noted to be intact.  Dr. Nathan Ball diagnosed plaintiff with lumbar pain as evidenced by chronic lumbar pain, left leg pain and weakness, and right shoulder pain.  Dr. Ball opined that plaintiff would be incapacitated by her impairment and prevented from engaging in employment for six to twelve months.  (Tr. 443-44.)

On April 23, 2010, plaintiff was evaluated by psychologist Steven B. Adams, Psy.D., in connection with an application for Medicaid.  Plaintiff reported having a depressed and irritable mood, anxiety, muscle tension, and rapid heartbeat.  Plaintiff reported feeling hopeless and having mood swings, memory problems, decreased energy, increased crying, thoughts of death, and compulsive behavior.  Plaintiff reported being stressed by chronic pain and finances.  Plaintiff reported her current physical problems to be headaches, injured right shoulder, and injured lower lumbar discs.  Her current medications were noted to be Valium for muscle spasms, Advil, and Tylenol.  Plaintiff reported that she had friends and enjoyed going to flea markets.  Mental status examination showed plaintiff to be alert and oriented times three.  Plaintiff made appropriate eye contact.  Her mood was anxious.  Dr. Adams noted plaintiff's intelligence and general fund of information to be at least average.  Plaintiff's judgment was good.  Dr. Adams diagnosed plaintiff with dysthymic disorder / rule out obsessive-compulsive disorder, and assigned a Global Assessment of Functioning (GAF) score of 65.[2]  He recommended treatment with anti-depressant medication as well as individual psychotherapy to work on anxiety management and pain management.  With respect to plaintiff's ability to work, Dr. Adams opined that plaintiff was able to understand and remember moderately complex instructions and could sustain concentration and persistence on complex tasks.  Dr. Adams further opined that plaintiff was able to interact in moderately demanding social situations and could adapt to a typical work environment.  (Tr. 445-47.)

On July 23, 2010, plaintiff visited Dr. Deborah Sheehan to establish care. Plaintiff reported a history of back injury with muscle spasms that kept her awake at night. Plaintiff was currently taking Advil, Aleve, Tylenol Arthritis, and Valium.  Plaintiff reported that she did not want to take any narcotic medication.  Plaintiff also reported that she was beginning

---

[2] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness."  *Diagnostic and Statistical Manual of Mental Disorders*, Text Revision 34 (4th ed. 2000).  A GAF score of 61 to 70 indicates some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning

to have severe anxiety and depression symptoms due to her pain and financial situation. She believed her mental condition started to decline when her adult son was killed the year before. Dr. Sheehan suggested counseling, and plaintiff was agreeable to this. Dr. Sheehan diagnosed plaintiff with anxiety/depression, chronic back pain, hyperlipidemia, and insomnia. Valium and Celexa were prescribed, and plaintiff was referred for counseling. (Tr. 449-57.)

In a Medical Source Statement of Ability to Do Work-Related Activities (MSS) dated July 26, 2010, Dr. Bennoch opined that plaintiff could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds; stand and/or walk a total of about six hours in an eight-hour workday; must periodically alternate between sitting and standing to relieve pain or discomfort; and was limited in her ability to push or pull with her lower extremity. Dr. Bennoch further opined that plaintiff should never climb ramps, poles, ladders, ropes, or scaffolds but could occasionally climb stairs. Dr. Bennoch opined that plaintiff should never balance but could occasionally kneel, crouch, crawl, or stoop. Dr. Bennoch opined that plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 437-41.)

On August 16, 2010, plaintiff visited Brett Young, LCSW, at Behavioral Health Care and reported that her emotions were "building." Plaintiff reported that her son and his fiancée were killed in 2007 and that the man who "ran them over" received a sentence of only four years. Mr. Young noted plaintiff to become tearful when talking of her son. Plaintiff reported that her severe back pain and financial condition also contributed to her irritability. Plaintiff reported often feeling depressed and that she cries easily, does not want to be around anyone, and has trouble focusing. Plaintiff reported having difficulty sleeping because of racing and worrying thoughts, and that she thought she was being punished for not being able to save her son. Mental status examination showed plaintiff to be cooperative and calm with normal speech and appropriate behavior. Plaintiff's thought process was within normal limits, and her judgment and insight were intact. Plaintiff's memory was also intact, and her attention and concentration were noted to be good and on task. Plaintiff's mood was depressed and her affect was congruent with her mood. Mr. Young diagnosed plaintiff with major depressive disorder, recurrent, severe, without psychotic features; generalized anxiety disorder; and posttraumatic stress disorder. A GAF score of 48-50 was assigned.[3] (Tr. 460-63.)

---

pretty well, has some meaningful interpersonal relationships.
[3] A GAF score of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional

Plaintiff returned to Behavioral Health Care on September 3, 2010, and reported to LCSW Carolyn E. Turner that she was irritable, sad, and angry and that she was experiencing grief, loss of sleep, and loss of appetite. Ms. Turner noted plaintiff's mood to be grieving and her affect was congruent with her mood. Plaintiff reported experiencing stressors with her own health issues as well as her husband's and mother's health. After supportive therapy, Ms. Turner reported that plaintiff achieved positive progress toward her goals. Plaintiff's GAF score remained at 48-50. (Tr. 464-65.)

Plaintiff visited Ms. Turner on October 8, 2010, who noted plaintiff to be angry and resentful. It was noted that the person responsible for her son's death was to be released from prison after serving a relatively short sentence. Ms. Turner reported that plaintiff was making appropriate progress toward her treatment goals, and her GAF score was increased to 51-53.[4] (Tr. 466-67.)

On October 20, 2010, plaintiff reported to Ms. Turner that the person responsible for her son's death was to be released in four days and that she was working very hard to manage her feelings of grief and anger. Ms. Turner noted plaintiff's mood to be normal with congruent affect. Ms. Turner reported that plaintiff was making appropriate progress toward her treatment goals. A GAF score of 50 was assigned. Plaintiff reported that she was experiencing pain at a level ten, and Ms. Turner recommended referral to a pain clinic. (Tr. 468-69.)

On October 27, 2010, plaintiff reported to Ms. Turner that she was angry and resentful. It was noted that plaintiff was having an extremely difficult time with the release from prison of the person who killed her son. Ms. Turner reported that plaintiff was making appropriate progress toward her treatment goals. A GAF score of 48-50 was assigned. (Tr. 470-71.)

Plaintiff returned to Ms. Turner on November 3, 2010, who noted plaintiff to have a normal mood and congruent affect. Plaintiff reported having continued anger, sadness, and irritability. Plaintiff was hopeful, however. Plaintiff was working hard to manage her emotions but struggled with knowing how to "let go." Ms. Turner reported that plaintiff was making

rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

[4] A GAF score of 51 to 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

appropriate progress toward her treatment goals, and her GAF score was increased to 54-57.  Ms. Turner again recommended referral to a pain clinic.  (Tr. 472.)

Three weeks later, on November 23, Ms. Turner noted plaintiff's mood and affect to be depressed.  Plaintiff reported being frightened and annoyed and experiencing stress because of family and moving issues.  Plaintiff was given information regarding continued counseling after her move, and Ms. Turner requested that plaintiff schedule periodic appointments.  Ms. Turner reported that plaintiff was making appropriate progress toward her treatment goals.  A GAF score of 51-53 was assigned, and plaintiff was instructed to return periodically for continued supportive therapy.  (Tr. 473-74.)

## IV.  The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social Security Act through the date of the decision.  The ALJ found that plaintiff had not engaged in substantial gainful activity since May 30, 2008.  The ALJ found that, through September 17, 2010, plaintiff had mild degenerative disc disease of the lumbosacral spine and a brief period of dysthymia, anxiety, and depression but did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix. 1.  The ALJ found that, through September 17, 2010, plaintiff had the RFC to perform the physical exertional and nonexertional requirements of work except for lifting or carrying more than ten pounds frequently or more than twenty pounds occasionally.  The ALJ determined there was no credible, medically-established mental or other nonexertional limitations.  The ALJ determined that plaintiff's past relevant work as a hotel desk clerk and storage facility clerk did not require the performance of work-related activities precluded by plaintiff's RFC and that plaintiff's impairments did not prevent her from performing such past relevant work through September 17, 2010.  The ALJ thus determined that plaintiff was not under a disability at any time on or before September 17, 2010.  (Tr. 22-23.)

## V.  Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

- 15 -

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, at Step 5, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and
        non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's
        impairments.

6.      The testimony of vocational experts when required which is
        based upon a proper hypothetical question which sets forth the
        claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

        For the following reasons, the ALJ did not commit reversible error and his decision is supported by substantial evidence on the record as a whole

        The Appeals Council ordered that, upon remand, the ALJ was to update the medical record to include evidence submitted and considered with plaintiff's subsequent applications for benefits; evaluate plaintiff's mental impairments in accordance with 20 C.F.R. §§ 404.1520a,

416.920a; consider medical opinion evidence in accordance with 20 C.F.R. §§ 404.1527, 416.927; and give further consideration to plaintiff's maximum RFC. A review of ALJ Muldoon's November 2012 decision shows him to have complied with these directives. The Appeals Council further ordered the ALJ to obtain supplemental evidence from a vocational expert, which ALJ Muldoon did not do. However, because the ALJ gave good reasons in his written decision as to why he did not call a vocational expert, and a review of the record *in toto* shows these reasons as well as the ultimate conclusion of non-disability to be supported by substantial evidence on the record as a whole, the failure to comply with this directive of the Appeals Council did not constitute reversible error.

An ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. §§ 404.977(b); 416.1477(b). Failure to adhere to the agency's remand order in subsequent administrative proceedings is itself legal error. *Hill v. Astrue*, No. 1:12CV56 DDN, 2013 WL 4054688, at *11 (E.D. Mo. Aug. 12, 2013), *aff'd sub nom. Hill v. Colvin*, 753 F.3d 798 (8th Cir. 2014). Such error may not rise to the level of reversible error, however, if the ALJ addresses the Appeals Council's directive, provides good reasons for taking action contrary to this directive, and renders a decision that complies with the relevant legal requirements and is supported by substantial evidence on the record as a whole. *Hill*, 2013 WL 4054688, at *12. This is what the ALJ did here.

In his written decision, the ALJ acknowledged that the Appeals Council's remand order included the directive to "get vocational expert input[.]" (Tr. 19.) The ALJ concluded, however, that such input was unnecessary inasmuch as the "medical evidence is pretty straightforward" as well as "the logical and reasonable conclusions to be derived from it." (*Id.*) Because the ALJ's review of the medical and other evidence led to a conclusion at Step 4 of the sequential analysis that plaintiff had the RFC to perform her past relevant work, eliciting evidence from a vocational expert was – as stated by the ALJ – unnecessary. *See Banks v. Massanari*, 258 F.3d 820, 827 (8th Cir. 2001) (en banc) ("[I]t is clear in our circuit that vocational expert testimony is not required at step four where the claimant retains the burden of proving she cannot perform her prior work."). Although in reaching this conclusion, ALJ Muldoon determined plaintiff to have fewer RFC limitations than the original RFC determined by ALJ Graham, a less restrictive RFC upon an Appeals Council remand does not constitute a basis upon which to reverse the ALJ's

decision if the less restrictive RFC is supported by substantial evidence on the record as a whole. *See Hill,* 2013 WL 4054688, at **12-13. For the following reasons, a reasonable mind can accept ALJ Muldoon's less limiting RFC assessment when viewed in light of the record as a whole and, as such, the RFC assessment must stand. *Hill*, 753 F.3d at 800 (citing *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012)).

Residual functional capacity is the most a claimant can do despite her physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). Some medical evidence must support the ALJ's RFC findings. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). It is the claimant's burden, however, and not the Commissioner's, to prove the claimant's RFC. *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003).

In determining plaintiff's RFC here, ALJ Muldoon thoroughly reviewed and appropriately analyzed all the evidence of record, including plaintiff's testimony, treatment records relating to plaintiff's mental and physical impairments, and medical opinion evidence. The ALJ noted that the record showed that plaintiff sustained an injury to her lumbar spine in September 2005 for which she sought and received treatment through October 2006. This treatment during that time included physical therapy, use of a TENS unit, and medication management with Valium, Ultram, and ibuprofen. Treating and consulting physicians also imposed functional work restrictions during this period limiting plaintiff to light work, lifting no more than twenty-five pounds, and providing for a sit/stand option every couple of hours for comfort. As noted by the ALJ, this treatment for plaintiff's impairment and the imposition of these functional restrictions all occurred prior to the alleged onset date of disability, that is, before May 30, 2008. Plaintiff sought no other treatment for this impairment until July 2010 when she sought to establish care with Dr. Sheehan. "While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

In addition, as noted by the ALJ, plaintiff actively and successfully worked with her

musculoskeletal impairment in 2007 and 2008, and no evidence of record demonstrates a deterioration of this condition at any time subsequent to the alleged onset date. Where a claimant effectively works with her impairment over a period of time and there is no indication that her condition significantly deteriorated on or after the alleged onset date of disability, it is reasonable to conclude that the impairment is not disabling. *See Goff,* 421 F.3d at 793.

The ALJ also noted that in February 2009 and April 2010, which is within the relevant period under review, plaintiff underwent consultative physical examinations for purposes of evaluating her eligibility for disability benefits and for Medicaid assistance, and that these examinations did not yield findings demonstrating a disability as defined by the Social Security Act and regulations. With respect to Dr. Cross's conclusions from his February 2009 examination - that plaintiff should be permitted to get in and out of a motor vehicle to walk and stretch every one to two hours; be limited to lifting no more than twenty-five pounds; and avoid high-impact activities such as jumping, jogging, running, and repetitive bending and stooping - the ALJ noted that such minor limitations would not have prevented plaintiff from performing the type of jobs she performed from 2006 to 2008 as such jobs are performed in the national economy. Substantial evidence on the record as a whole supports this finding, including vocational expert testimony from the August 2010 hearing. (*See* Tr. 71-73.) While not required at Step 4, vocational expert testimony may be considered by an ALJ in determining that a claimant is able to perform past relevant work. *Wagner v. Astrue*, 499 F.3d 842, 853-54 (8th Cir. 2007); *Banks*, 258 F.3d at 827.

With respect to Dr. Ball's conclusion from the April 2010 Medicaid eligibility examination - that plaintiff's lumbar pain prevented her from engaging in employment for a six-to-twelve-month period - the ALJ noted that guidelines for determining unemployability under Missouri law differ from Social Security regulations, especially regarding the relevant period of time an individual must be considered unemployable in order to be considered eligible for benefits. (Tr. 19.) An ALJ need not accord great weight to the opinion of a one-time consulting physician on the ultimate issue of whether a claimant is employable, especially when the consulting physician bases his conclusion on programs other than Social Security disability. *See Ellis v. Barnhart*, 392 F.3d 988, 994-95 (8th Cir. 2005) (medical source's opinion that claimant is unable to work involves issue reserved for Commissioner and is not the type of opinion the Commissioner must credit); 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1) (same); 20 C.F.R. §§

404.1527(c)(2)(i), 416.927(c)(2)(i) (length of treatment relationship is relevant to weight accorded to opinion evidence); 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6) (medical source's level of understanding of Social Security disability programs and their evidentiary requirements is relevant to weight accorded to opinion evidence). In addition, as noted by the ALJ, Dr. Ball opined that any disability experienced by plaintiff would last for a period of only six to twelve months. To be eligible for Social Security disability benefits, however, a claimant's disability must have lasted or be expected to last "for a continuous period of *not less than* 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (emphasis added); *see also Barnhart v. Walton*, 535 U.S. 212, 218-22 (2002). The ALJ did not err in according limited weight to Dr. Ball's April 2010 opinion.

The ALJ also considered Dr. Bennoch's July 2010 MSS and accorded little or no weight to the opinions expressed therein inasmuch as Dr. Bennoch was a non-treating physician who examined plaintiff on one occasion in August 2006 for litigation-related purposes. The ALJ noted that Dr. Bennoch had not examined plaintiff since August 2006 - which was well before her alleged onset date of disability, and that plaintiff had engaged in substantial earnings activity after that time. The ALJ considered Dr. Bennoch's July 2010 opinions, rendered four years after he last saw plaintiff, to be a "sort of afterthought" and not credible medical evidence and thus not a significant factor in evaluating plaintiff's case. (Tr. 20.) These reasons to accord Dr. Bennoch's July 2010 MSS little or no weight are supported by substantial evidence on the record as a whole, and the ALJ did not err in this determination. *See* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) (length of treatment relationship is relevant to weight accorded to opinion evidence); 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (degree to which opinion considers all pertinent evidence of a claimant's claim is relevant to weight accorded to opinion evidence). *Cf. Brockman v. Sullivan*, 987 F.2d 1344, 1348 (8th Cir. 1993) (ALJ did not err in failing to include additional RFC limitations where only evidence of impairment was remote diagnosis rendered years before relevant period of alleged disability, and no evidence showed current impairment); *see also Frankl v. Shalala*, 47 F.3d 935 (8th Cir. 1995) (error to rely on remote medical evidence to determine RFC).

Finally, with respect to plaintiff's mental impairments, the ALJ complied with the Appeals Council's directive to evaluate such impairments in accordance with 20 C.F.R. §§ 404.1520a, 416.920a. These regulations require an ALJ to determine the severity of a mental

impairment by rating the degree of functional loss the impairment causes a claimant to suffer in broad areas of functioning, and specifically, in areas of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

> When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. . . .
>
> . . .
>
> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe . . . .

20 C.F.R. §§ 404.1520a(c)(4)-(d)(1), 416.920a(c)(4)-(d)(1).

Here, the ALJ summarized the evidence of record and, after undergoing the required analysis set out above, found that prior to September 18, 2010, plaintiff's mental impairment caused no restrictions in activities of daily living or in maintaining social functioning; that there was no evidence of deficiencies in concentration, persistence, or pace; and no recorded episodes of decompensation. The ALJ thus concluded that, in terms of mental functioning, plaintiff had no limitation or no more than a minimal limitation in her ability to do basic work activities that would contribute to a finding of disability. (Tr. 22.) As demonstrated below, substantial evidence on the record as a whole supports this determination.

The ALJ summarized the evidence of record relating to plaintiff's mental impairment and specifically noted that there was no evidence of any impairment prior to Dr. Adams' diagnoses in April 2010 made in relation to plaintiff's Medicaid application; and that even with such diagnoses, Dr. Adams opined that plaintiff had no significant mental functional limitations. A diagnosis of a mental impairment does not in itself equate with a finding that the impairment causes significant limitations. *Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011). "Depression . . . is not necessarily disabling." *Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990).

The ALJ also noted that plaintiff did not independently seek treatment for any mental impairment until July 2010, at which time she complained to Dr. Sheehan of depression and anxiety. While plaintiff was prescribed Celexa at that time and participated in psychotherapy through November 2010, the ALJ noted the record was silent as to whether plaintiff continued with any mental health treatment thereafter. Although plaintiff is critical of the ALJ's consideration of the lack of record evidence after November 2010 given that plaintiff had been determined to be disabled as of September 18, 2010, the undersigned agrees with the Commissioner's position that such evidence was relevant to the ALJ's finding that any limitations arguably caused by a mental impairment did not have a duration of at least twelve continuous months, which is required in order to be considered disabling.

In addition, the record shows that through September 17, 2010, plaintiff exhibited essentially normal behavior during mental status examinations and did not demonstrate significant psychiatric or psychological symptoms. Indeed, during the administrative hearing in August 2010, plaintiff testified that she was having no depressive symptoms and that her anxiety involved "mainly normal human feelings." These clinical observations of plaintiff's normal behavior during the relevant period, coupled with plaintiff's own testimony that she did not believe her symptoms were debilitating or anything other than normal, further support the ALJ's decision that plaintiff's mental impairments imposed no limitation or no more than a minimal limitation in her ability to do basic work activities. *See, e.g., Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) (ALJ's finding that claimant's mental impairment was not severe was supported by medical evidence that plaintiff exhibited normal judgment, recall, comprehension, behavior, and calculation).

Where a claimant suffers no limitations in the broad areas of functioning as defined in the regulations, it follows that an ALJ does not err in failing to include any mental limitations in the RFC assessment. *Cf. Buckner,* 646 F.3d at 561 (ALJ may omit mental limitations from hypothetical question where such limitations are not severe) (citing *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998)). Because substantial evidence on the record as a whole supports the ALJ's finding that plaintiff had no mental limitation or no more than a minimal mental limitation in her ability to do basic work activities, he did not err in failing to include mental limitations in his RFC assessment.

In sum, a review of ALJ Muldoon's November 2012 decision shows that in accordance

with the Appeals Council order, he updated the record and considered evidence submitted with plaintiff's subsequent applications for benefits[5]; evaluated plaintiff's mental impairments in accordance with 20 C.F.R. §§ 404.1520a, 416.920a; considered medical opinion evidence in accordance with 20 C.F.R. §§ 404.1527, 416.927; and gave further consideration to plaintiff's maximum RFC. Upon a thorough review and appropriate analysis of all the evidence of record, including plaintiff's testimony,[6] treatment records relating to plaintiff's mental and physical impairments, and medical opinion evidence, ALJ Muldoon determined at Step 4 of the sequential analysis that plaintiff's RFC did not preclude her from performing her past relevant work as a hotel desk clerk and storage facility clerk. This finding is supported by substantial evidence on the record as a whole. Because the ALJ made this determination of non-disability at Step 4 of the evaluation process and did not proceed to Step 5, vocational expert testimony was not required. *Hill*, 753 F.3d at 801. Accordingly, although the ALJ failed to comply with the Appeals Council's directive to obtain evidence from a vocational expert upon remand, such failure did not constitute reversible error inasmuch as the ALJ properly followed the sequential evaluation process upon remand and his conclusion as to non-disability during the relevant period was supported by substantial evidence on the record as a whole. *Id.*

## VI. Conclusion

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

_____/S/ David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 20, 2015.

---

[5] Although plaintiff argues for the first time in her Reply Brief that the ALJ did not include such evidence in the record (Pltf.'s Reply, Doc. #27 at pp. 2-3), plaintiff does not identify what other evidence was submitted with her subsequent applications but not considered by the ALJ here. Indeed, plaintiff concedes that the ALJ considered new evidence of plaintiff's treatment by Dr. Sheehan in July 2010 as well as by Behavioral Health Care from August to November 2010, which was not a part of the record on her original applications for benefits. (*Id.* at p. 3.)

[6] Plaintiff does not challenge the ALJ's credibility determination in this case. In her Reply Brief, however, plaintiff argues that the ALJ improperly considered her receipt of unemployment benefits as a basis upon which to find her allegations of disability to be inconsistent with the record as a whole. (Pltf.'s Reply, Doc. #27 at pp. 1-2.) In *Smith v. Colvin*, however, the Eighth Circuit recently reaffirmed that a claimant's application for unemployment benefits adversely affects the claimant's credibility inasmuch as an unemployment applicant must hold herself out as available, willing, and able to work. 756 F.3d 621, 625 (8th Cir. 2014).